UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**LEA N. GEER**,                                              Case No. 6:12-CV-01796-KI

                          Plaintiff,                         OPINION AND ORDER

        v.

**CAROLYN W. COLVIN**,

                          Defendant.

        Alan Stuart Graf, P.C.
        316 Second Rd.
        Summertown, TN 38483

                Attorney for Plaintiff

        S. Amanda Marshall
        United States Attorney
        District of Oregon
        Adrian L. Brown
        Assistant United States Attorney
        1000 SW Third Ave., Suite 600
        Portland, OR 97201-2902

Page 1 - OPINION AND ORDER

Erin F. Highland
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900 M/S 221A
Seattle, WA 98104-7075

        Attorneys for Defendant


KING, Judge:

Plaintiff Lea N. Geer brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Geer filed an application for DIB on July 11, 2006. The application was denied initially and upon reconsideration. After a timely request for a hearing, Geer, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on February 18, 2009.

On March 4, 2009, the ALJ issued a decision finding that Geer was not disabled within the meaning of the Act and therefore not entitled to benefits. The Appeals Council vacated and remanded the decision to reconsider evidence in light of her date last insured of December 31, 2008, to adequately address lay witness testimony of Dennis Geer and Cynthia Robledo, and to assess how Geer's mental impairments affect her Residual Functional Capacity ("RFC").

Geer, again represented by counsel, appeared and testified before an ALJ on May 26, 2010. On June 28, 2010, the ALJ issued a decision finding Geer not disabled. This decision

became the final decision of the Commissioner when the Appeals Council declined to review the

decision of the ALJ on August 15, 2012.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  Parra v.

Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance.  Id. (internal quotation omitted).  The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations.  Id.

## THE ALJ'S DECISION

The ALJ concluded Geer suffered from mild degenerative disc disease of the cervical and thoracic spine, fibromyalgia, somatoform disorder, depressive disorder NOS, and generalized anxiety disorder.  The ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  He assessed her RFC at light work, with the ability to balance, kneel and climb ramps and stairs frequently.  However, he found her limited to no more than occasional performance on all other postural activities, and he believed she was capable of performing simple, routine, repetitive tasks.  Relying on the testimony of a Vocational Expert ("VE"), the ALJ concluded Geer could perform her past relevant work as a cannery worker and labeler.  Alternatively, she could perform work as a final assembler, addresser, and document sorter.

## FACTS

Geer was 48 years old on her date last insured.  She has a GED and has worked as a cannery worker, a labeler, and a home health aide.  She was terminated from her most recent job

as a home health aide in May 2006 because she was having trouble lifting her client; she initially testified she had trouble lifting after she fell out of a boat, but, when she was reminded the incident had occurred after she stopped working, she testified her fibromyalgia was bothering her. She reported she could not sit more than 20 minutes, walk more than 30 minutes, or lift more than five pounds at a time, and that she suffered from short-term memory loss and cried easily. She experienced pain over her whole body and she was tired. She has three adult children, one of whom has multiple sclerosis and is in an electric wheelchair and one who has cerebral palsy. Both live with her but are independent.

Nazmul Hoque, M.D., treated Geer's diffuse muculoskeletal pain, anxiety and depression from 2004 through 2008. He prescribed Vicodin consistently, but also tried Prozac, Cymbalta, Ultram, Wellbutrin, and Soma. Her pain was fairly stable with a combination of medications until, in April of 2006, she reported stiffness and worsening of her pain; Dr. Hoque added Fosamax, Xanax, and Nexium to her regimen.

On July 5, 2006, she arrived at the emergency department at Samaritan Pacific Communities Hospital having fallen between a boat and a cement dock two weeks before; her husband pulled her out of the water. She complained of pain in her left elbow and shoulder. There was no evidence of fracture or dislocation, and Joseph Goldman, DO, assessed "[s]omatic dysfunction of the infraspinatus, supraspinatus, trapezius, levator scapula, deltoid, biceps, and serratus anterior, all on the left side." Tr. 353. From the date of this accident, when summarizing her medical history, she repeatedly described it as follows: she "tore all the muscles off" her arm bones after a fall from a boat. Tr. 399 (12/2/2006); Tr. 453 (1/9/2007); Tr. 459 (1/15/2007); Tr. 119 (2/18/2009); Tr. 58 (5/26/2010).

Page 6 - OPINION AND ORDER

She returned to Dr. Hoque on July 21, explaining she had been to the emergency room earlier that month. She said the pain was getting better until she subsequently twisted and fell again, landing on her left shoulder. She said the Vicodin and Vicoprofen he had prescribed were not working. Dr. Hoque opined the etiology of Geer's pain was unclear, but he sent her for an x-ray. He noted "she has fibromyalgia and this could be psychogenic." Tr. 414. In August, she reported continued neck pain and cervical radiculopathy. She tried cleaning her house, but her pain went to 10 out of 10; she was taking 10 Vicoprofen a day. Dr. Hoque prescribed MS Contin for three days, as well as Ativan, Elavil, Cymbalta, and Soma. Geer's fibromyalgia was improving in October with amitryiptyline. At that time, Dr. Hoque recommended a fibromyalgia clinic, which subsequently confirmed the diagnosis. Dr. Hoque prescribed Morphine for her severe, chronic, intractable pain in November, but Geer could not tolerate the drug. On January 8, 2007, Dr. Hoque referred her to a pain specialist.

John H. Ellison, M.D., undertook a comprehensive rheumatology examination of Geer on January 9, 2007, and reported Geer's complaints of migraine headaches, a "reverse curve" of her cervical spine, weak legs, stiffness and soreness. Tr. 453. He noted normal results for her dorsolumbar spine, hips, knees, ankles, elbows, wrists and fingers; negative straight leg raising; and normal gait, coordination, motor strength, sensory exam, and reflexes. He noted some limitation in flexion, extension, and rotation in Geer's cervical spine and in her shoulder elevation, extension, abduction and adduction. An updated MRI showed mild degenerative changes at C5-C6 and in the thoracic spine. He assessed headaches due to muscle tension, anxiety and depression, general muscle pain and tenderness "supposedly" due to fibromyalgia and being overweight. Tr. 455.

At the request of Disability Determination Services, Ronald D. Duvall, Ph.D., assessed Geer's mental health on January 15, 2007. He noted Geer demonstrated "[e]xtreme illness focus verbally; did not show any non-verbal pain behavior during the entire 90 minutes. Sat very still and looked comfortable doing so." Tr. 460. He diagnosed her with pain disorder, associated with psychological factors, dysthymia; chronic, moderate depression; moderate generalized anxiety disorder; personality disorder, NOS; and assessed her Global Assessment of Functioning ("GAF") at 55 to 60.[1] Dr. Duvall felt Geer's primary diagnosis was Somatoform Disorder, finding her depressed and affected by family stressors, and that "her pain complaints appear to serve the secondary gain of getting nurturance [sic] from her family, as well as time out from normal adult responsibilities." Tr. 462. He also noted her "verbal report of severe pain was discrepant with her lack of non-verbal pain behavior during the examination." Id. Additionally, he believed "she is cognitively able to work at such jobs as she has had in the past. Her limitations are putatively physical, although a review of her medical records did not suggest to me any serious physical disabilities." Id.

On January 23, 2007, Geer established counseling with Patricia Canning, PMHNP, precipitated by her mother's physical decline. She and her brother were the primary caretakers for her mother, but hospice was evaluating her mother the next day. Geer had been the primary caretaker the previous three days because her mother had asked for her over Geer's brother. Geer

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 51 to 60 means "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV").

denied cyclical mood swings, but reported depression and anxiety the past two weeks. Canning diagnosed adjustment disorder with mixed anxiety and depression; mood disorder due to fibromyalgia and chronic pain; GAF of 50. Canning recommended Geer increase her Cymbalta. Two weeks later, Geer reported feeling an improvement in her mood; Canning assessed her GAF at 55. One week later, Geer talked about her mother's death, but was managing well; Canning assessed Geer's GAF at 60.

Over a month later, Geer expressed anxiety about her living situation. Her son and his girlfriend were living in the house without paying rent. Canning noted Geer was taking too much Lorazepam and needed to take it as directed. Geer did not return to the office for seven months because of cancellations and no-shows. When she did return, for one more visit on November 29, 2007, Canning recommended finding mental health services in the county, but Geer was unwilling to do so. She was not sleeping and was feeling sadness over her mother's death. Canning gave her samples of Seroquel and Cymbalta.

In the meantime, Geer had returned to Dr. Hoque, in July of 2007, complaining of chronic pain at a level ten without medication. Dr. Hoque prescribed Vicodin and Soma. He continued to treat her anxiety and pain with Vicodin and Soma in August, but then did not see her again until April 2008.

On April 7, 2008, Geer sought medical care at the Samaritan emergency department for a fall down some unlighted stairs at a Timbers game. She reported taking twice as much Vicodin as usual for pain. The treating physician described Geer as "somewhat tearful . . . who looks to be in pain. However, she is able to sit up, stand and ambulate without assistance." Tr. 531. In addition, the physician observed Geer "limping in a dramatic sense, but when distracted has no

limp." Id.  She was prescribed Percocet with no refills.  On April 22, Geer returned to Dr. Hoque

complaining of pain from the fall.  He noted mild limitation of shoulder joint because of pain, but

no soft tissue swelling.  He prescribed Percocet.

At Canning's referral, Geer established mental health counseling with the Lincoln County

Health and Human Services on May 30, 2008.  Geer described mood swings, temper problems,

and the need for Seroquel, the only medication that helped her sleep.  Dr. Hoque refused to

prescribe it.  Geer described sexual abuse from her grandfather between the ages of two and

eight.  She obtained counseling from Joan Barry-Gertz, M.A. in June and July.  On September

18, 2008 she met with Della Fogerson, PMHNP, for medication management.  Geer explained

she had stopped working two years ago and she missed it.  She reported cyclic behaviors,

including depression and racing thoughts, and being easily distracted, hyperactive, and impulsive

at times.  She walked slowly and with difficulty down the hall, but sat quietly and relaxed in the

chair.  Fogerson diagnosed Bipolar Disorder, NOS, per history and PTSD.

When Dr. Hoque decided to specialize, he referred Geer to the Depoe Bay Clinic.  She

established care with Diane Eshleman, NP, on December 22, 2008.  Geer sought pain medication

refills for her arthritis and fibromyalgia.  She was not getting any regular exercise.  Her husband

reported Geer had improved on bipolar medications.  However, Geer was using more Vicodin

per month than prescribed, and Eshleman explained Geer would need to agree to an opiate

therapy schedule, to include regular exercise.  Eshleman met with Geer on December 31, who

asked for pain medication for a fall down three stairs about a week ago; she hurt her tailbone and

left hip.  Geer also reported losing the second bottle of her Vicodin (60 pills) and she was not due

for a refill until January 11, 2009.  Eshleman called Geer's pharmacist who explained Geer

Page 10 - OPINION AND ORDER

received 120 Vicodin pills in two bottles on December 19.  Geer had tried to refill early, saying a family member had stolen the bottle.  This was not the first time Geer had requested the pharmacist refill her lost medications.  Eshleman prescribed Endocet as a Vicodin replacement.

At her next appointment in January 2009, Geer complained about the Endocet and asked for Vicodin instead.  She took more of the Endocet than she was supposed to and she was out of them two days early.  Eshleman asked for a urine sample for a drug screen, but Geer was not able to urinate for the random test; Eshleman told her to go to a lab located near her sometime that day and to not urinate before her next office visit.  Eshleman reminded Geer of her medication management plan and gave her a prescription to be filled in two days.

Geer returned to the Lincoln County mental health department on February 3, 2009 and saw Lynne Clark, PMHNP, to get refills of her medications.  She requested free samples of Cymbalta and Seroquel since she could not afford the co-payments.  Two weeks later, she complained about Depoe Bay Clinic making changes to her pain medications; she wanted someone at the County to intervene and "make them give me the right meds again."  Tr. 717.  When she returned in March, she was tearful about being denied disability.  She did not want to see a therapist or change her medications.  At the end of March, she was able to soothe herself and became pleasant and engaging, after an initial tearful session.  Her gait was slow, but she was not limping.

At the next visit with Eshleman in April, Geer reported taking her medications as directed.  However, she refused a random urine drug test, claiming she "just went" and besides "I did not take my pain med this morning so I was safe to drive here."  Tr. 668.  Eshleman noted Geer's last drug screen was questionable as it showed a drug Geer was not taking.  It also did not

Page 11 - OPINION AND ORDER

show a positive for benzos (lorazepam) as Eshleman would have expected. Eshleman offered a

quick mini-catheter so Geer could take her medications with her, and she agreed. However,

while a room was being prepared, Geer "promptly told the receptionist she hurt too much and

was going home to take a pain pill, would return later." Tr. 668.

      Geer returned to the County's mental health department in May and reported being stable

on her medications and that she was doing well. In June, Geer explained to Clark she had

walked out on a UA and was no longer getting pain medications from Depoe Bay Clinic.

However, she was having trouble finding another provider. She was not demonstrating narcotic

withdrawal, but Clark prescribed clonidine for comfort just in case. Geer still had not found a

primary care physician by July, and she had fallen and hurt her ankle again. Clark noticed Geer's

speech was mildly slurred and she looked sedated, although Geer denied taking any medications.

Geer reported she had not had any narcotics the past two weeks, although Clark noted this

contradicted Geer's earlier statement that she had been given 20 pain pills when she injured her

ankle. She was not showing any symptoms of acute withdrawal, and Clark refused to refill the

clonidine. Although Clark repeatedly recommended seeing a therapist, Geer had not followed

through. By September 2009, Geer reported doing well overall. She was back on Cymbalta and

Vicodin. She reported doing well in October and November, and she cancelled her appointment

in December, and reported doing well in February of 2010.

      Geer saw Bradford Witman, PA-C, three times in September and October of 2009. She

reported taking Norco (the same as Vicodin but with different levels of acetaminophen and

hydrocodone), but complained it was not controlling her muscle aches and joint pain. The pain

was occasionally 10 out of 10 in the mornings. Witman added an anti-inflammatory called

Mobic to the existing Norco prescription.  Two weeks later, Geer reported the Mobic had not

worked.  Witman told her he would consider filling her Vicodin early as she had used more in the

last few days, but he needed a pain contract.  In October, she asked for a refill early, and Witman

agreed, but had her sign a pain contract.

Geer then established care with Lincoln Community Health Center on April 2, 2010.  Her

main concerns were chest pressure with a productive cough and obtaining medication refills.  She

reported Witman had terminated her care due to non-payment two or three months previously.

She had run out of narcotics a month ago.  She reported constant pain with some relief from

Vicodin.  When next she came into the office, in May, she reported a stable condition.

Geer has a history of running out of her pain medication early.  In addition to the times

mentioned above, she showed up at Samaritan complaining of a cough on September 5, 2004.

She reported running out of her Vicodin two days before.  She had tried to contact Dr. Hoque,

but could not get a prescription called in.  The ER gave her six Vicodin and directed to follow up

with Dr. Hoque.  On December 11, 2004, she reported to Samaritan that she believed a visitor at

her house had taken her Vicodin.  She had called Dr. Hoque to get a refill, but he would not refill

her prescription until December 18.  She had an infection on her finger treated, and the physician

prescribed Ultram because he was hesitant to give her Vicodin when her own doctor refused.

Tr. 378.

## DISCUSSION

### I.    Geer's Credibility

The ALJ found Geer's statements about her limitations not entirely credible.  He noted

she received unemployment benefits when she claimed to be incapable of working, that she gave

contradictory explanations for stopping work, and that she initially answered she could not

perform lighter work because it would be less pay.  Additionally, the ALJ referenced Geer caring

for her mother for almost a year following her onset date of disability, that she exaggerated her

condition, engaged in drug-seeking behavior, failed to follow medical advice, and that she treated

her fibromyalgia with narcotics when this is not the accepted method of treatment.

When deciding whether to accept the subjective symptom testimony of a claimant, the

ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective

medical evidence of one or more impairments which could reasonably be expected to produce

some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The

claimant is not required to show that the impairment could reasonably be expected to cause the

severity of the symptom, but only to show that it could reasonably have caused some degree of

the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the

claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically

identify the testimony she or he finds not to be credible and must explain what evidence

undermines the testimony."  Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  General

findings are insufficient to support an adverse credibility determination and the ALJ must rely on

substantial evidence.  Id.  "[U]nless an ALJ makes a finding of malingering based on affirmative

evidence thereof, he or she may only find an applicant not credible by making specific findings

as to credibility and stating clear and convincing reasons for each."  Robbins v. Soc. Sec.

Admin., 466 F.3d 880, 883 (9th Cir. 2006).

Geer challenges most of the justifications given by the ALJ.  First, with respect to

unemployment benefits, Geer contends she never held herself out as able to work full time.  In

Carmickle v. Commisioner, the court agreed holding oneself out for *full* time work would be

inconsistent with disability allegations, but not part time work.  533 F.3d 1155, 1162 (9th Cir.

2008).  The Commissioner points to Geer's testimony that she sought work up until only six

months to a year before the hearing, and that she understood by applying for unemployment

benefits she was ready, willing and able to work.  The Commissioner relies on Copeland v.

Bowen, 861 F.2d 536, 542 (9th Cir. 1988), and Bohall v. Astrue, No. 09-5479KLS, 2010 WL

1740770, at *10 (W. D. Wash. Apr. 29, 2010).

Absent evidence in the record from which the ALJ could conclude Geer was looking for

full time work, Geer's acceptance of unemployment benefits says nothing about her credibility

pursuant to the more recent Carmickle decision.  Nevertheless, just as in Carmickle, the ALJ's

error is harmless because he gave other clear and convincing reasons supported by substantial

evidence in the record to question her statements.  533 F.3d at 1163.

Geer argues the record does not reflect how much care she provided to her mother as

compared with her brother.  However, Geer and her brother were the primary caretakers for their

mother, in plaintiff's home, and at least one record indicated her mother expressed a preference

for Geer over her brother.  So long as the ALJ's interpretation of the evidence is supported by

inferences reasonably drawn from the record, the court may not question the ALJ's interpretation.

Batson v. Comm'r, 359 F.3d 1190, 1193 (9th Cir. 2004).

Geer contends her "one-time" description of tearing her muscles from the bone when she

fell was more hyperbole than misrepresentation, and her description was what the injury felt like.

The record reflects, however, with respect to her fall from the boat, that Geer repeatedly

informed medical providers about this injury in the context of giving a *medical history* and not in

Page 15 - OPINION AND ORDER

the context of explaining what the injury felt like; she made these statements just months later and before any lengthy Social Security appeal process was underway.  There was no support in the medical record for her statement.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) (tendency to exaggerate appropriate credibility factor).  Additionally, as another example of Geer's tendency to exaggerate, the ALJ pointed to Geer's testimony at the hearing that she was experiencing pain at 10 out of 10 when Geer appeared to be sitting comfortably.  Multiple medical providers similarly noted Geer's tendency to exaggerate.  Tr. 453, 460, and 531.  Geer argues her exaggerations and inconsistencies are a "cry for help" to grab the Agency's attention when her disability appeal has taken years to resolve.  Again, however, the court must uphold the ALJ's interpretation of the evidence if it is supported by inferences reasonably drawn from the record, as it is here.  Batson, 359 F.3d at 1193.

Geer admits her addiction to narcotics, and contends it was the result of her pain regimen.  Yet, she argues, she had limits–she declined Morphine when a trial of that medication was not successful.  While Geer's drug seeking behavior may be attributed to a pain regimen gone wrong, the ALJ was entitled to consider her reports of lost or stolen medication, inconsistent statements to pharmacists and doctors about those lost or stolen medications, and refusal to take drug tests, as a reflection on her credibility.  Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999) ("Where the evidence may reasonably support more than one interpretation, [the court] may not substitute [its] judgment for that of the Commissioner.").

Geer challenges the ALJ's conclusion that fibromyalgia should not be treated with narcotics when there is no basis in the record for such a finding.  I agree.  The decision of a physician to prescribe narcotics to treat Geer's fibromyalgia cannot be a reason to question

Geer's credibility.  Nevertheless, again, the fact that the ALJ improperly considered this reason for finding plaintiff's credibility undermined does not mean that the ALJ's entire credibility assessment is improper.  Batson, 359 F.3d at 1197.

Geer contends the ALJ also found her testimony less than credible because he did not believe there was objective evidence to support her complaints, citing to page 25 of the transcript.  Geer cites, however, to the ALJ's summary of Geer's emergency room visit after falling in the water; the physician examined Geer and found no objective evidence of any injury and he diagnosed somatic dysfunction.  The ALJ's reference to this event was for medical history purposes and was not a reason he gave to question Geer's credibility.

Geer argues the ALJ improperly considered her statements as reflecting poorly on her credibility, when they were actually a symptom of her personality disorder or PTSD.  She suggests that when she reported her muscles were ripped from the bone, she was vocalizing her mental illness.  The ALJ specifically addressed this issue, however, when he wrote, with respect to her fall from the boat, "While her subjective experiencing [sic] of pain may be influenced by her somatoform disorder, there is no explanation for why she would repeatedly describe a specific type of injury that never occurred."  Tr. 30.  The ALJ did not err.

Finally, Geer questions the ALJ's reliance on one reference to her failure to engage in physical activity, as an example of her failure to follow medical advice, in a 765 page record.  However, the ALJ not only relied on Geer's failure to engage in physical activity, but also relied on her repeated failure to take her pain medication as instructed.  While Geer would have the ALJ consider her failure to follow instructions as an indication of poor pain management, the ALJ was entitled to conclude she may have been exaggerating her complaints of pain to feed her

Page 17 - OPINION AND ORDER

narcotics addiction or to divert her medication.  <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039 (9th Cir. 2008) ("unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" is appropriate factor to consider); <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1157 (9th Cir. 2001) (likelihood that claimant was exaggerating pain to feed Valium addiction was reason to reject testimony).

In sum, the ALJ's reasons for rejecting Geer's complaints about her pain and limitations are supported by clear and convincing reasons.

II.    <u>Lay Testimony</u>

The ALJ discussed the written testimony of Geer's former employer William Huff, as well as the hearing testimony of her husband Dennis Geer and her friend Cindy Robledo.  The ALJ gave no weight to Huff's testimony and assigned only some weight to Robledo and Geer.  Geer takes issue with the ALJ's resolution of these statements, but she also argues the ALJ should have addressed the report of an Agency worker who interviewed Geer for her application.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  <u>Stout v. Comm'r of Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006).

A.    <u>Agency Report</u>

Geer argues the ALJ must treat the report of Agency staff observations as lay witness testimony.  An Agency worker wrote the following about Geer:

Lea was on the phone with me for about 2.5 hours because I had two claims with her (her child also filed).  During that time she constantly moved around, groaned and winced in pain.  At one point she started to cry after about 2 hours and was having a hard time continuing the interview.

Tr. 265.  The Agency worker also wrote:

> [Geer] was very serious and gave short quick answers most of the time.  I could tell she was very uncomfortable and wanted to get the interview over as soon as possible.  She sounded sad and showed no sign of laughter.  She would wince in the middle of a sentence and have to start over again.

Id.

The Commissioner concedes the ALJ did not reference the Agency observations in his opinion, but argues Agency observations are not competent lay testimony.  I agree.  The staff person had one interaction with Geer over the phone; there is no evidence as to what experience the staff person had, what his background was, or his title.  Further, a lay witness must have had sufficient contact with the claimant in order to qualify as a competent lay witness.  Crane v. Shalala, 76 F.3d 251, 254 (9th Cir. 1996) (two week interaction with claimant did not qualify therapist as lay witness); Smith v. Barnhart, No. C 00-4185 SI, 2002 WL 485050, at *4 (N.D. Cal. Mar. 27, 2002) (agency interviewer not a lay witness given lack of contact with claimant); Bolar v. Astrue, No. ED CV 10-1748 PJW, 2011 WL 5036826, at *2 (C.D. Cal. Oct. 24, 2011) (questioning whether agency interviewer was lay witness).  The ALJ did not err.

B.    William Huff

Huff, Geer's former employer, wrote:

> Lea Geer is a former employee.  She worked for us as my care giver for about 1 ½ years.  I am a quadriplegic on a ventilator.  Lea had chronic pain, soreness and stiffness during her employment.  Some days she couldn't work at all, due to pain.  Lea was well liked, and did an excellent job, but her body refused to allow her to continue working.

Tr. 313.  The ALJ rejected this testimony because it reflected only Geer's statements to Huff about why she could not come into work, when the ALJ found Geer not credible.  Additionally,

Page 19 - OPINION AND ORDER

the work required heavy exertion, exceeding Geer's RFC, making Huff's comments irrelevant when evaluating Geer's ability to perform lighter work. Geer argues in response that Huff had the opportunity to observe her and could deduce the reason for her missing work.

Regardless of whether Huff's statement about Geer missing work was based on his own observations or Geer's explanation to him about missing work, Huff's testimony is irrelevant to whether Geer could perform lighter work. The VE placed her former work as a home health aide at heavy to very heavy, and the ALJ concluded Geer was incapable of performing such a job. As a result, Huff's observations, as the ALJ noted, are irrelevant. The ALJ did not err.

C.    Dennis Geer

Dennis Geer testified he had been with Geer for 24 years, and he noticed that around May of 2006 she was having trouble getting out of bed in the morning due to stiffness, and that she was achy and had no energy. When she was working, her attendance was bad and he would call in for her after she had worked two or three days because she could not get out of bed. Mr. Geer also commented that since her fall into the water, she had problems with her shoulders, neck and hips, including tingling in her upper extremities. Mr. Geer had taken over paying the bills because Geer made mistakes. Sometimes when Mr. Geer came home from work, he would find Geer in her pajamas sitting on the bed and crying. She could do chores around the house, on a good day, for 30 to 45 minutes.

The ALJ accepted the testimony to the extent it was consistent with Geer's RFC, but rejected the remainder of it. The ALJ noted again that simply because Geer experienced difficulty with a heavy exertion job did not mean she was unable to perform lighter work. Additionally, Mr. Geer's observations about his wife's limitations after her fall were inconsistent

Page 20 - OPINION AND ORDER

with the medical record and lack of objective findings.  The ALJ accepted Mr. Geer's comment

that Geer was stiff, achy and lacked energy after she stopped working because she no longer

engaged in any physical activity whatsoever, even though it was recommended for pain

management.

Geer contends the ALJ neglected to address many of Mr. Geer's observations.  She

ascribes Mr. Geer's comments about her upper extremity injury to her fibromyalgia, which is not

amenable to objective findings.  In addition, if objective findings were required, Dr. Hoque

repeatedly noted soft tissue tenderness throughout the time he treated Geer.  She contends Mr.

Geer testified to waxing and waning of her symptoms.

Geer's husband never testified to waxing and waning symptoms.  Instead, he testified to

progressive worsening of Geer's symptoms from the time she stopped working.  The ALJ

rejected the testimony, noting that when Geer stopped working she also stopped any physical

activity so it made sense she would be stiff and achy.  The ALJ also gave a germane reason for

rejecting Mr. Geer's testimony about Geer's absences from work, since the job required the

lifting that Geer could no longer do.  In addition, Mr. Geer never mentioned fibromyalgia.

Instead, when the ALJ asked about Geer's symptoms after her fall from the boat, Mr. Geer

testified to Geer's pain in her upper shoulders, neck, and hip lasting a long time.  As the ALJ

explained, however, these observations were not consistent with the medical record.  The ALJ

gave germane reasons to partially reject Mr. Geer's testimony.

D.    <u>Cynthia Robledo</u>

Cynthia Robledo testified that she stopped by Geer's house three or four times a week to

help with household chores.  She volunteered her help as a friend.  Robledo noticed Geer was in

pain and was lying down and could not finish the housework on her own.  Sometimes Geer

helped fold laundry for 30 minutes, but then she had to lie down.  Robledo also noticed Geer's

depression and forgetfulness, and that she used a cane.

The ALJ accepted the testimony to the extent it was consistent with Geer's RFC, but

rejected the remainder of it.  He found no medical reason for Geer's need to lie down frequently

or use a cane.  He also found it odd that Geer would need Robledo's help when Geer cared for

her mother after her onset date of disability and the medical record did not indicate Geer's

condition had worsened.

Geer points out she cared for her mother, with her brother's help, for approximately eight

months in 2006 and early 2007, and Robledo did not start helping Geer until February of 2008.

There is also no evidence as to how much she did to care for her mother and she asserts the

ALJ's reasoning is speculative.

As I indicated above, the record supports the ALJ's conclusion that Geer's ability to care

for her mother, as one of two primary caregivers in Geer's home, undermines her testimony

about her inability to work.  Additionally, Geer does not address the fact that nothing in the

medical record indicates Geer's condition worsened in early 2008 such that she required

Robledo's help three or four times a week.  The ALJ also questioned Geer's need to use a cane

when it had not been prescribed, when her knee injury occurred 23 years ago, and when she had

never seen a specialist for her knee.  Additionally, the ALJ noted no doctor had ever told Geer to

lie down for any portion of the day.  The ALJ gave germane reasons for only partially accepting

Robledo's testimony.

Page 22 - OPINION AND ORDER

III.    <u>Residual Functional Capacity</u>

Finally, Geer argues the hypothetical did not include the ALJ's own finding that she had "moderate" limitations in concentration, persistence and pace. She argues the limitation to simple, routine and repetitive tasks does not account for her problems with concentration, persistence or pace.

The ALJ's RFC was consistent with Dr. Duvall's assertion that Geer "is cognitively able to work at such jobs as she has had in the past. Her limitations are putatively physical, although a review of her medical records did not suggest to me any serious physical disabilities." Tr. 462. Because substantial evidence supports the conclusion that Geer could perform routine, repetitive work with simple instructions, despite any possible concentration problems, the ALJ's conclusion should be upheld. <u>See</u> <u>Howard v. Massanari</u>, 255 F.3d 577, 582 (9th Cir. 2001) (PRTF containing a limitation of often having deficiencies of concentration, persistence or pace which was interpreted into a functional capacity assessment of being "able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function" was adequately captured in a hypothetical for "someone who is capable of doing simple, repetitive, routine tasks"); <u>see also</u> <u>Sabin v. Astrue</u>, 337 Fed. App'x 617, 621 (9th Cir. 2009) (moderate concentration, persistence or pace difficulties consistent with medical evidence that claimant could perform simple and repetitive tasks); <u>Brink v. Astrue</u>, No. 3:12-cv-01131-MA, 2013 WL 1785803, at *5 (D. Or. Apr. 24, 2013) (citing multiple cases for the same proposition); <u>Hamilton v. Astrue</u>, No. 03:11-CV-6063-HU, 2012 WL 3314303 (D. Or. June 15, 2012) (the "end result of [claimant's] concentration and/or attention difficulties was that she could do simple, routine tasks on an independent basis"). Because the

Page 23 - OPINION AND ORDER

ALJ's conclusion is reasonable in light of the entire record and is supported by substantial evidence, I affirm it.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards.  For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ___7th___ day of October, 2013.


 /s/ Garr M. King
Garr M. King
United States District Judge


Page 24 - OPINION AND ORDER